Good morning, Your Honors. Thomas Boyd here on behalf of the appellant, Todd Mortier, who represents Kaysan Interventionals' former owners. Appellants sold Kaysan with its innovative transcatheter mitral valve replacement device to LivaNova in 2017. LivaNova subsequently breached the terms of the party's purchase agreement, and appellants sued. Appellants have brought forth substantial fact and expert evidence to support their claims against LivaNova. However, the district court erroneously held that the purchase agreement allowed LivaNova to operate the business as it saw fit, and in doing so, rendered the terms of the negotiated purchase agreement meaningless. Further, the court erroneously, rather than submitting the case to the jury, erroneously weighed the evidence, disregarded expert evidence, and summarily entered judgment in favor of LivaNova. There is more than sufficient evidence. There is substantial evidence for a jury to conclude that LivaNova failed to do what they promised to do, and therefore, appellants asked the court to reverse the judgment and remand for a jury trial. Under the terms of the party's sale, appellants agreed to defer $39.6 million, more than half of the purchase price, in reliance on LivaNova's agreement to undertake such efforts, use such level of care, and make business decisions consistent with the efforts, the level of care, and business decisions LivaNova and its affiliates generally employed to obtain the remaining regulatory approvals to bring the device to market. This is a multidimensional obligation, imposing an efforts requirement, a level of care requirement, and a business decision-making requirement, each of which must be consistent with LivaNova's efforts, level of care, and decision making as to other businesses that it had invested in. Well, you state that generally, and you argue it generally in the main brief, but you rely on Section 4.3. Yes. And appellees even failed to highlight the relevant portion of 4.3. Correct. But you return to it in your reply brief, and that is related to regulatory approval. And the district court said that, identifies no disputed issue of material facts showing that LivaNova failed to undertake the efforts and level of care necessary to be consistent with the efforts and level of care generally employs in seeking regulatory approval for its SPIs. And that, to me, is kind of the essence of the issue on appeal. And my question is, even in your reply brief, I don't see any identification of failure to act consistently insofar as seeking regulatory approval, because bailing out before the approvals is granted. I mean, everybody recognizes the breach. The breach was multifold. First of all, they did not apply the resources. They did not imply the efforts. Where's the evidence that that had anything to do with the status or likelihood of regulatory approval? The evidence is in their own projected results. First of all, with regard to going back to the and in the reply brief to emphasize all aspects of 4.3, the requirements for efforts, the requirements for level of care, and the decision-making, all three, this isn't just a process. This requires the application of resources. Rather than applying consistent resources to our business compared to the others. I mean, from a standpoint of 4.3, the argument isn't linked to the regulatory approval process. It absolutely is. If you fail to apply the resources and undermine the ability to achieve those regulatory goals, you're killing it in the room. You're killing it before it gets a chance to get off the ground. As opposed to all of the other comparable businesses. Where do I go on the record for that specific evidence? You can go to the Crosby report, which sets forth all of the evidence. With regard to the He doesn't interpret contracts in this court. No, he doesn't. He sets forth what the evidence is. And on pages 38 as well as 56, and actually I'll cite to the appendix, pages 44, pages 62, 63, 72, 78, and 113. He compares the resources that were applied to the Kason business compared to the other comparables, which the parties had agreed would be the comparables. That's the universe to compare it with. What do you think is the significance of that language that Judge Loken was quoting? Seeking, prosecuting, and eventually obtaining product regulatory approvals. Is that a limitation on the obligation? In other words, that there are certain efforts and business decisions that are not employed generally in the process of seeking regulatory approval, and those would not be covered. But there are other business decisions and levels of care and so forth that are oriented toward regulatory approvals, and those would be covered. Are we talking about two different actions by the company, or you don't agree with that? You think it's all covered? No. Levenova invested in a number of businesses, and they're all encompassed in the strategic investment portfolio. The reason they invested was to bring those products to market. The way to bring them to market is get regulatory approval. That's the common denominator. The one that, when you look at the evidence, and again, the Crosby report is a catalog... So you're saying it's almost surplusage because every product has to go through regulatory approval, so you think that's sort of odd language to have if it has no... It's not odd language insofar as the parties wanted to embody what their expectations were. Here, we're talking about the development of a medical device that, in order to get it to commercial use, has to go through the regulatory process. Further, again, my clients deferred more than half... It's a very difficult process. Deferred more than half of the purchase price contingent on going through that process, relying on the good faith efforts of the purchaser to apply the resources, to exert the level of care, and to make the business decisions that are aimed towards obtaining the regulatory approval. We may have a disagreement between Lee Vanova and my clients as to whether they brought to bear all of those requirements, but that's a jury question. That's not for the judge to decide as a matter of law. Well, you've got to give enough evidence, though, to get to the jury, right? Yeah. Okay. Did you do that? Yes, we did. We certainly did. That's getting to breach. We're talking about what is the interpretation of 4.0? Right. And this court just is... Your interpretation is, to me, makes it an almost incomprehensibly broad warranty that very few, if any, courts would enforce. Well, this is what... First of all, this is what the parties negotiated. Rather... They negotiated that limit, what I do consider a limitation, a clear limitation based upon why they went to Sorin in the first place, because that's what Sorin knew how to do. Without that language, what would the provision mean? If it's just efforts, level of care, and business decisions, to do what? It's to pursue the reason, the raison d'etre. It's to pursue the very purpose of the transaction. But I don't see any... I mean, all of the things that the district court describes in terms of market and competitive conditions that were threatening the likelihood and certainly the length of regulatory approval, those aren't breaches. Even though the company's own internal rate of return scored us on the high end. Even though Ernst & Young said that our chances of going through regulatory approval were high. Likelihood's pretty important. Yeah, yeah. Likelihood, as is good faith and fair dealing. To the extent that they have any discretion under this provision, they have to pursue, they need to put forth the requisite efforts to pursue the regulatory approval. They failed to do that. They cut our budget to the extent they decided they wanted to go in a different direction. I don't see any reference to dealings with CE or FDA that were interfered with, or delayed, or postponed, or aggravated, or whatever, negatively affected, by all the things that are in these massive appendix. How about shuttering the company? How can you deal with the FDA when you close down the business? You say, okay, we agreed to pay you $39.9 million, but we're going to go to a different business line. That's at the end of the road. When market and competitive conditions have shown, this is hopeless, you have to go to FDA and say, is this hopeless now? Your Honor, you've just made a finding of fact. Let the jury decide whether it's hopeless. Frankly, the evidence is far from demonstrating that. I understand. That's the... That's absolutely the question for the jury. No, but the question is, if we, after you properly interpret 4.3, then is there evidence of breach to get you to the jury? And I'm cutting into my time, so let me be brief. First of all, in order to interpret 4.3, you have to give it meaning. If you interpret it to leave Inova, operate the way it wants to, it's meaningless. It writes out efforts, it writes out level of care, it writes out business decisions. With regard to evidence, Your Honor, again, there's substantial evidence and we... There's my way or there's no way. I'm saying, no, a reasonable interpretation can be halfway. Okay. And that's what I'm arguing for. And to the extent there's any discretion, then the implied duty of good faith and fair dealing apply. But their interpretation, the district court's interpretation renders it meaningless. It can't just be, you can do business the way you want to. That's no contract provision at all. Well, I just read your passage where that isn't the way the district court writes. Well, that's... I mean, that's the rest of the discussion because that's the way it was briefed. But it seems to me the district court is more... That's what the court held on page 10 and page 11 of its opinion. What are you referring to? The district court's decision. No, but I mean, what statements? Oh, leave Inova argues the provision allowed it to operate the business as it saw fit. On the next page, the court adopted that. This provision does not mean that leave Inova was not free to operate its business as it saw fit. It found that that was the reasonable interpretation. That renders the provision meaningless. It writes out efforts. It writes out level of care. And it renders decision-making to just a meaningless process. So you think it means that the jury or fact finder has to compare how they proceeded with this outfit, this company versus what? With the other businesses that made up the strategic investment portfolio. And they're specifically identified. Again, whether the expert report comes in or not, the evidence is set forth here. The jury is supposed to look at the whole portfolio and decide, did they treat this company in terms of seeking regulatory approval the way they treated everybody else? Exactly. Did they shutter this company without applying the resources and putting in the effort? Whereas other companies that had the same issues, it decided to continue to pursue. That is the epitome of inconsistency. And a jury can find that's inconsistent and that's a breach. And the internal rate of return is a great example. That's specifically called out by the parties in the negotiated provision 4.3. In 2018, Kaysan had the highest internal rate of return, which meant it had the greatest projected rate of success in 2018 as compared to these other businesses. And we're not asking the jury to go out on the street and find out who these businesses are. These are specifically identified businesses that the parties agree constitute the universe for comparison. I have 33 seconds left, if I could reserve my time. Mr. Van Orn. Good morning, Your Honors. May it please the Court. The District Court correctly granted summary judgment for LevaNova, and this Court should affirm. I'll focus on the Section 4.3 claim, like Mr. Boyd did, and which turns on contract interpretation. As the District Court correctly held, Section 4.3 unambiguously gave LevaNova the discretion to make business decisions based on its own financial interests. Consistent with the way it did other businesses, right? The scope, yeah, was set by its own practices, not an objective third-party standard, its own practices. And the standard for measurement, Your Honor, was consistent with. Consistent with what it did generally from time to time. It was not, the standard is not the same as or similar to, it's consistent with. What consistent with means is the decisions here have to be explainable by the same principles you apply everywhere. The same business decisions. That's the metric. This is business decisions is a clear reference to Delaware's business judgment rule. Justice Frankfurter says when you bring in the term, it brings the old soil with it. It doesn't state business judgment. No, Your Honor. But the Delaware statement of the business judgment rule is expressly based on business decisions. That's the Parnes decision from the Delaware Supreme Court. That's their basic statement of the rule. It's Delaware 1999. But what this says... Are you granting summary judgment or not after trial? What's that? Well, the statement in Parnes was business judgment rule generally. But in terms of cases that grant summary judgment on clauses like this, the closest case here is the Banas v. Volcano Court case. It was actually in the Northern District of California, but Judge Oreck was applying Delaware law. The reason it's so similar is because it granted summary judgment for the defendant and the clause there was a self-referential clause like our clause is, Your Honor. I'm looking for what case you're talking about. Yeah. Is it in the red brief? Is it in your brief? Yeah. It's in the red brief. It's Banas, B-A-N-A-S, versus Volcano Court. The language was not the same as this language, was it? No. There isn't any clause in any of the cases that directly matches this one. But the relevant part there is it was self-referential. It was the same kind of standard. You have to do, make reasonable decisions based on being consistent with what you ordinarily do. All of the cases that Mortier, the plaintiff, cites here are best efforts cases or commercially reasonable external. Not a single one of them has this language. Why do you think Banas is helpful? It was self-referential and the court said what? Well, and it granted summary judgment. And it granted summary judgment on the same basis that we're saying is proper here in this clause unambiguously gives discretion to make business decisions as long as they're consistent with, not the same as. So, for example, you can make opposite decisions and still have them be consistent. You can give one product more, give one product less. How could that be consistent? Well, if this one that you raised has greater opportunity, less risk, and this one that you cut has less opportunity and more risk, that's consistent. And who decides that? Who decides whether that's what they did? In the first instance, the business decides and that's where the discretion comes in. There is no way, and this goes to your point, Judge Loken, your question, there is no way, nobody agrees under Delaware law to a contract provision that makes every single business decision a fact question of breach. Nobody agrees to that. And that's not what Delaware law says. That's where the discretion comes in. I bet you have trouble proving that. But isn't it true that 4.3 says you've got to consider cost-benefit concern to return on similar business decisions? So it does give factors. Yeah. Like I said, those referential, we are not arguing, Your Honor, that you don't look at what happened to case on and compare it to what, leave a note with the others and ask, are they consistent? The two questions are, does consistent with mean the same as or explainable on the same business principles? That's one key thing. And the second thing is, is there any kind of discretion here or is this always straight up de novo so that everything's always a fact issue? Argument is there's no way it's de novo, everything's a fact issue. That's not what Delaware law says and that's not what this says. I don't understand what you mean it's not what Delaware law says. It's a question of what the parties agreed to. Exactly, Your Honor. And here they referred to business. So let's look at the indications that there's discretion. Number one, it says you get to make business decisions. The whole concept of making decisions is discretionary. And then not only do you get to make decisions, but they don't have to be the same, they only have to be consistent with. Like I said, you have to be able to explain them by the same financial factors. And then consistent with what? Not with any particular other thing, but just what you do generally. And not even that, but generally what you do from time to time. And not only that, but you can include all of these financial considerations and business considerations, including cost and benefit. Don't you think you have to consider those considerations? I think that if they made a decision without thinking about any business-oriented thing at all, they would breach those. No, I'm talking about cost-benefit return investments, the ones that are listed. Do you have to consider those? I don't think, Your Honor, that you have to produce a slide deck saying, okay, here's IRR, here's return on investment, here's cost-benefit. I don't think it's that at all. Oh, why are they mentioning the contract then? It's an including. It's a permissive grant to leave ANOVA to consider things that are in its own financial interest. It isn't required to act against its interest, right? There are clauses that require you to act to maximize sales and earnouts. The CONMED decision that the plaintiff cites has one of those. You had to take actions to maximize sales and earnouts. That's not this at all. This allows leave ANOVA to act in its own business decisions. And here's what happened. Four things happened. Leave ANOVA's chief competitor, Abbott, had a clinical triumph, right? This is the quote. It wildly surpassed expectations. So that happened in September of 2018. Biggest competitor had a triumph. Two months later, you know what happened to our clinical with Kaysen? It was a catastrophe. They had to shut it down because too many people were dying and getting seriously injured. Out of 30 patients, seven died within 30 days. And this is the critical part here. Don't take our word for it. This is the FDA reviewer. It said they had significant concerns and our internal conclusion was we had to shut it down before likely getting forced to do so by the FDA. All right. Back-to-back months. Competitor has a triumph. We have a catastrophe. September, November. Then you hit the first quarter and leave ANOVA has a big earnings miss. None of this is disputed. And so it's sitting there and it's asking, all right, now what do we do? What they did is they made a business decision. There are three key slide decks, your honors, from February, April, and October 2019. Just if you want to go see what their decision making was. They start at Appendix 942, Appendix 956, and Appendix 1024. And basically what they say is, all right, we're in a cash crunch now. We need to make decisions. And what they concluded was Kaysen would cost the most, would take the longest to get profitable, had the highest risk. So what are we going to choose? We're not going to choose the one that costs the most, takes the longest, and has the highest risk. And there's no dispute. And out of all of the things that are argued by the other side, there's no argument about whether it costs the most, take the longest, or had the highest risk. All right. Those are the business factors. And the real question, I think, for the other side under this clause and on this is, is there any business decision that they think Leva-Konova would make that would not create an issue of fact for a jury? Any at all. But how many more people would have to die? How much more would it have to cost? How much longer would it have to take? How much better would the competitor have to do before it's not a fact question? They didn't have to agree to 4.3. No. If that's a fair reading of the intent of this decision, so be it. That's the question, Your Honor, isn't it? It's a contract interpretation. You think my focus on the regulatory approval is misguided. Well, Your Honor, I agree with you that there's no argument about them, about anything going wrong in the regulatory approval process directly. Our position has been always that the reason there's no fact issue here is because of what I said, which is that this creates discretion on that to make business decisions. That's the only fair reading of this. And that within that, as long as it's explainable by these same factors, there's no fact question on this. Now, they argue... What does that mean, explainable by the same factors? I mean, you could explain it by the same factors in an unreasonable way. Would that be still no breach? No. No, Your Honor. What's the standard then? What do you mean explainable by the same factors? Let's say they say, we looked at all these factors and we rejected case on, and how do we analyze it then, whether that's permissible or not? The standard we think applies is the Delaware Business Judgment Standard, and this is Farns. Go ahead. I hear what Your Honor is saying, right? I mean, it's an all or nothing. You're pretty much arguing, you know, it's a business judgment rule, so as long as it's a business judgment, we win. And the other side is kind of arguing everything goes to the jury, you know. Here's what the Delaware standard actually is, Your Honor. It's where the decision under TAC is so far beyond the bounds of reasonable judgment that it seems inexplicable on any ground other than bad faith. So you think it's a bad faith, all this requires is good faith? I think there are... You could have written it a lot more simply if you just wanted to say, we're applying the Delaware business judgment rule, good faith is all that's required. I want to distinguish, Your Honor, between subjective good faith and objective readings, because objective bad faith would clearly breach. Attempting to shift profits to avoid milestones would clearly breach, say, in that subjective way. There are other things that you could make that would be inexplicable. So, for example, suppose the facts were flipped here. The competitor has a terrible clinical trial. We have a great clinical trial. We're flush with cash and we cut it anyway. Unless there's something else there, that would breach this clause. And it doesn't have to do with bad faith or good faith subjectively like that, but it just wouldn't be a business decision anymore. It would be inexplicable. And so that sort of thing would breach. So this clause is not meaningless, but it's not super tight, right? It gives broad discretion on here. And compared to other clauses, and they point this out, often what merger agreements will do is they'll have two things and they'll be sort of inconsistent. They'll say the buyer has sole discretion, but you have to use objectively commercial reasonable efforts nonetheless. And then courts have to figure out what goes on. This clause combined the two, instead of having competing clauses, said you get to make business decisions based on financial considerations. And that's the standard that the district court concluded it applied. And that's the standard that we think is the correct one. Because it solves these two extremes. It gives it meaning. So if it was a good faith decision, but inexplicable, that would breach? Yes, exactly. The question you think for us is whether a reasonable jury could find this to be an inexplicable decision? Yes, exactly. That's your standard. And does that include the three factors that are listed? Yeah, it does. And so I want to, let me speak directly to internal rate of return. Yeah, please. On that, first of all, the other side is overstating the difference on internal rate of return. We put it in our brief exactly. And this was in line with the other internal rates of return. It wasn't awesome. It wasn't terrible. It was there. Internal rate of return doesn't speak at all either to risk. There's nothing about it that speaks to risk. You didn't put risk in the contract. Sure we did. Cost-benefit. Return on investment. It's usually risk-reward. Go ahead. Proceed. Your Honor, if we want to go to the mat on whether business decisions includes taking into account risk, I'm pretty confident on that one. But so it costs benefit and risk. Internal rate of return doesn't go on risk. You can have a high internal rate of return because it's just based on your projections of what might happen and be terribly risky. This was the highest risk one. It was the highest risk from a technology perspective. It was highest risk clinically. It was highest risk commercially. That's in the slide decks. Internal rate of return doesn't account for that. We can cut the chase on my concern because I've not looked at your slide desk. Yeah. Do they have cost-benefit, internal return, and return on investment? Yeah. Sure they do. Okay. A lot or a little. So the internal rate of return... I'm sorry. Can you answer the question in an instance of time? Is that they have a lot in those three factors or little on those three factors? I'm sorry. I'm not sure I understand. You know, if you look at the slides, will a lot of them have cost-benefit, internal return, and return on investment or not? Did they spend a lot of time on it, Your Honor? Yeah. Yeah. You know, the slides, do they have those three factors? Oh, no. There isn't a lot of time on those three factors. There's a lot of time on finances generally. But in these three decks, there's not a lot on those three particular factors. There are other documents that have them. Sure. But it's clear here. They said it would cost the most, take the longest, be the most risky. We shouldn't do it. And that does not state a breach of this contract. So Your Honor should affirm. If you have further questions, I'm at my time. I'm glad to answer them, Judge Benton. No, we were just smiling that you were done. All right. Thank you. I'll give you two minutes for rebuttal. Thanks so much, Your Honor. First of all, you've just heard Lee Vanova's opening argument to the jury. They've set forth their view of the evidence. We have rebutted that factual recitation in our reply brief at pages 12 to 15, as well as, again, the evidence that's chronicled in the Crosby report. Judge Colleton, you asked, who decides? It's the jury who decides. This is a uniquely— Well, what's the stand—what do you have to show to get to a jury? Are you saying every—is there any case that would not be a jury case under your reading of this? Certainly, there would be some. First of all, let me frame it. This is not a business judgment rule provision. As the Court has recognized, it would have been easy for the parties to have done that. That's not what this says. To the extent application and the provision provides—or the requirement is to seek, prosecute, and eventually obtain regulatory approval, if we do all—if Lee Vanova did all those things and the EU still said no, you don't have to keep trying. So, there are a number of circumstances in which, perhaps, it would not be a jury question. With regard to the Bannas case, we distinguish that on page 11, footnote 10, of our reply brief. In that case, there were no comparables. Here, we have five comparables that have been identified. With regard to— Did you give enough—yes or no, did you give enough information on the five comparables? Excuse me? Did you give enough information about the five comparables? Again, the Crosby report is the size of a phone book. The analysis of—or the information about the comparables was before the management team. It was constantly reviewed. That's what the jury is entitled to review. One last point, Your Honor, if I—I'm sorry. Go ahead. No. Well, I just wanted to know if you agreed that your product or your initiative would cost the most, take the longest, and have the highest risk. I disagree. Is that understood? I disagree, and that's contrary to the IRR, which Levenova itself calculated, and Ernst & White did independently. Well, he says IRR doesn't really—doesn't really go to risk. Our discussion reflects why there should be decided by the jury. All right, what was your last point? My last point, Your Honor, there was quite an emphasis by Levenova's counsel about the discretion that apparently they view as built in to 4.3. If that's the case, then the fact issues are did they act reasonably and did they act in good faith? Delaware law, airborne health versus squid soap, 984, Atlantic 2nd, 126, and 146 and 47, and footnote 1 says when a contract confers discretion on one party, the implied covenant requires that the discretion be used reasonably and in good faith. Those are fact issues for the— Are they in the briefs? It is. Okay. Yes. Yes, Your Honor. And that's in our main brief as well as the reply. To the extent that the 4.3 allows for discretion, there's still an issue for the jury to decide as to whether they act reasonably and in good faith. And for all the reasons set forth in our brief and in the Crosby report, the evidence shows they were not acting reasonably and it was not in good faith. Thank you for your time this morning, Your Honor.